UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                                           :
JIMMY E. McMILLAN III (AKA) JAMES,                         :
                                                           :
                          Plaintiff,                       :
                                                           :        **<u>MEMORANDUM and ORDER</u>**
              – against –                                  :
                                                           :        03 CV 626 (SLT)(LB)
THE CITY OF NEW YORK, *et al.*,                            :
                                                           :
                          Defendants.                      :
                                                           :
------------------------------------------------------------------x
**TOWNES, United States District Judge:**

      Plaintiff, Jimmy E. McMillan III ("Plaintiff") brings this action pursuant to 42 U.S.C.

§ 1983 against the City of New York, the New York City Police Department ("NYPD"),

Lieutenant Joseph Santangelo, and Police Officers James Armstrong and Karl Richards

(collectively, the "Defendants"), principally alleging that he was falsely arrested while gathering

the signatures needed to place him and his "Rent is Too Damn High Party" on the ballot for the

gubernatorial elections in 2002.  Plaintiff's Amended Complaint ("Am. Comp.") ¶¶ 3-4.

Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure, principally arguing that the police had probable cause to arrest Plaintiff.  For the

reasons set forth below, Defendants' motion is granted and this action is dismissed.

***BACKGROUND***

      By his own account, Plaintiff is a 62-year-old Vietnam Veteran who suffered serious

physical and mental problems as a result of his military service.  Deposition of James E.

McMillan, III ("Plaintiff's Deposition") (attached as Ex. D to the Affidavit of John H. Graziadei)

at 48.[1]  Despite his history of problems, Plaintiff decided to run for Governor of the State of New York in 2002.  According to Plaintiff, one of the reasons he "wanted to takeover [sic] this state as governor" was to stop "some things going on within the [police] department."  *Id.* at 119-20.  At his deposition, Plaintiff candidly admitted that he not only did not trust the police, *id.* at 119, but believed that they were trying to kill him.  *Id.* at 116.

The incident at issue in this case took place late in the afternoon on July 3, 2002, as Plaintiff was attempting to collect the signatures necessary to place his name and that of his party on the gubernatorial ballot.  By all accounts, Plaintiff had set up a table in front of 540 Nostrand Avenue, near a stairwell leading to the Nostrand Avenue "A" train station.  He was in possession of a bullhorn, which he had purchased for $99 and was using periodically.  *Id.* at 155, 164.  However, Plaintiff did not have a permit to use any sort of sound amplification device.  *Id.* at 164-65.

At approximately 6:00 that evening, Joseph Santangelo – then, a sergeant assigned to the 79th Precinct – and Police Officer Karl Richards were patrolling together near Nostrand Avenue and Fulton Streets, within the confines of the 79th Precinct.  Affidavit of Joseph Santangelo ("Santangelo Aff.") at ¶¶ 2-3; Declaration of Karl Richards ("Richards Dec.") at ¶¶ 2-3.  According to both officers, "numerous pedestrians approached [them] to complain about an individual who was standing next to a table he had placed near the Nostrand Avenue subway

---

[1]According to Plaintiff, he went to the Veterans Administration Hospital almost every day between his discharge from the military in 1969 until sometime in 1985.  Plaintiff's Deposition at 55-56.  In the mid-nineties, he was involuntarily committed to mental hospitals after twice climbing to the top of the Brooklyn Bridge.  *Id.* at 23, 40.  Plaintiff denies that he was contemplating suicide at the time but, at his deposition, could not explain why he climbed the tower other than to state that he felt that "[h]eight was good for [him]."  *Id.* at 40-41.

station." Santangelo Aff. at ¶ 3; Richards Dec. at ¶ 3. These pedestrians complained that the individual was blocking traffic on the sidewalk and subway stairs, and was shouting through a bullhorn "in close proximity to pedestrians." Santangelo Aff. at ¶¶ 4-5; Richards Dec. at ¶¶ 4-5.

As Santangelo and Richards proceeded north on Nostrand Avenue, they observed Plaintiff standing near the subway entrance. Santangelo Aff. at ¶ 6; Richards Dec. at ¶ 6. According to the officers, Plaintiff had positioned a table bearing his campaign literature "in such a way that he created a tight bottleneck through which pedestrians had to pass in order to enter and exit the subway station and move down the street." Santangelo Aff. at ¶ 7; Richards Dec. at ¶ 7. Both officers recalled that Plaintiff was shouting at nearby pedestrians through his bullhorn, with the volume set so high as to distort Plaintiff's voice and to create feedback, resulting in a "high-pitched, siren-like noise." Santangelo Aff. at ¶¶ 8-9; Richards Dec. at ¶¶ 8-9.

At a deposition conducted on January 18, 2005, Plaintiff denied that he was blocking access to the subway. Plaintiff's Deposition at 162. Although Plaintiff testified that he "never measured how far" he was from the station entrance, *id*., he recalled that he was "a distance" from the steps, "[m]aybe 25 yards." *Id*. at 152. Plaintiff also denied that he was using his bullhorn when the officers first approached, *id*. at 177, though he readily admitted having used the bullhorn at other times that day. *Id*. at 164.

Both officers recalled that Santangelo approached Plaintiff and asked whether he had a permit to use the bullhorn. Santangelo Aff. at ¶ 11; Richards Dec. at ¶ 11. Plaintiff, however, was hard of hearing and was relying principally on lip reading in order to understand what other people were saying. Plaintiff's Deposition at 123-24. Plaintiff understood that Santangelo was

talking about a permit, *id*. at 174-75, but apparently thought Santangelo was demanding to see "a permit for petitioning for signatures." *Id*. at 134. At his deposition, Plaintiff initially testified that "[n]obody said nothing to [him] about a bullhorn," but immediately qualified that answer by saying, "If they did I didn't hear [them]." *Id*. at 169.

Both officers recalled that Plaintiff responded to Santangelo's inquiry by stating that he did not have a permit. Santangelo Aff. at ¶ 12; Richards Dec. at ¶ 12. According to the officers, Santangelo then informed Plaintiff that he was not permitted to use a sound amplification device without a permit. Santangelo Aff. at ¶ 13; Richards Dec. at ¶ 13. Santangelo also asked Plaintiff to move a short distance from the subway steps in order to allow people to enter and leave the station. Santangelo Aff. at ¶ 15; Richards Dec. at ¶ 15. Although Santangelo assured Plaintiff that "he could continue to distribute his pamphlets and speak to the public provided he did not interfere with or impede the flow of pedestrian traffic and did not use his bullhorn," *id*., Plaintiff continued to use his bullhorn and "indicated by word and gesture that he would not move away from the station entrance." Santangelo Aff. at ¶¶ 15-16; Richards Dec. at ¶¶ 15-16.

By all accounts, an argument ensued between the officers and Plaintiff. Santangelo Aff. at ¶ 17; Richards Dec. at ¶ 17; Plaintiff's Deposition at 134. Other officers responded to the scene, Santangelo Aff. at ¶ 18; Richards Dec. at ¶ 18, and, according to Plaintiff, surrounded his table, preventing citizens from signing his petitions. Plaintiff's Deposition at 134, 168, 180. Plaintiff believed then – and continued to believe at the time of the deposition – that the officers were acting to prevent him "from becom[ing] governor of the State of New York." *Id*. at 82, 179. However, in documents filed in opposition to the instant motion for summary judgment, Plaintiff opined that the officers "acted out of anger" over Plaintiff's refusal to obey their orders.

Plaintiff's Opposition, dated Dec. 18, 2007, at 1, 5.

Convinced that the officers were violating the law, Plaintiff demanded that the officers step away from the table and refused to communicate with them until they did. *Id*. at 149, 179. Plaintiff then "over talked them," drawing attention to the disturbance and exhorting the public to "call New York 1" and other television stations to alert them that he was "being treated like this running for public office." *Id*. at 134, 178-79. At first, Plaintiff – a big man who "talk[s] loud anyway" – may not have used the bullhorn. *Id*. at 178. However, at some juncture, aware that his "voice was going," Plaintiff picked up the bullhorn and started to use it. *Id*. at 134, 178.

By Plaintiff's own admission, officers warned him not to use the bullhorn as soon as he picked it up. At his deposition, Plaintiff testified:

> [W]hen I picked it [the bullhorn] up somebody said put it down, you can't use it. I read his lips. I know what he said. I read his lips. He said put it down, you can't use that unless you have got a permit you can't use it.

*Id*. at 177. Plaintiff admitted that he used it nonetheless, although he claimed the bullhorn was set at "low volume." *Id*. at 134, 153.

Drawn by the disturbance, a crowd of pedestrians gathered near the subway entrance, blocking the stairs. Santangelo Aff. at ¶ 19; Richards Dec. at ¶ 19. Santangelo and Richards both believed that the blocked subway entrance posed safety risks, especially since it was rush hour in a high traffic area. Santangelo Aff. at ¶ 20; Richards Dec. at ¶ 20. However, Plaintiff refused to budge, telling the officers that he "wasn't going to stop campaigning." Plaintiff's Deposition at 181. At 6:13 p.m., when it became apparent to the officers that Plaintiff was not going move from the subway entrance or stop using the bullhorn, Officer Richards placed Plaintiff under arrest. Santangelo Aff. at ¶ 21; Richards Dec. at ¶ 21.

Plaintiff was handcuffed and placed in the back of a patrol car. Santangelo Aff. at ¶ 23; Richards Dec. at ¶ 23; Plaintiff's Deposition at 182, 187. There, Plaintiff waited for what he perceived as a "long time" while the police took down the table and loaded it and Plaintiff's other belongings into the trunk of the car. Plaintiff's Deposition at 187, 189. Plaintiff alleges that, during this period, he saw a man steal his black leather bag containing completed petitions. *Id.* at 187-88. When Plaintiff alerted the officers to the theft and complained that he was seated in an uncomfortable position, he was told to "shut the fuck up." *Id.* at 188-89.

Eventually, the police drove Plaintiff to the 79th Precinct. Santangelo Aff. at ¶ 23; Richards Dec. at ¶ 23; Plaintiff's Deposition at 190. Although Officer Richards began to prepare a Property Clerk's Invoice for the bullhorn, Officer Richards recalls that he subsequently decided to issue Plaintiff summonses and to release him with his property. Richards Dec. at ¶ 25 and Ex. D. Officer Richards issued Plaintiff two summonses: one for disorderly conduct in violation of New York Penal Law § 240.20(5) and one for use of a non-commercial sound device without a permit, in violation of section 10-108(d) of the New York City Administrative Code. *Id.* at ¶ 24 and Ex. C. According to the police, Plaintiff was released from custody with his bullhorn, his table and all of his other personal property at 7:17 p.m. – approximately one hour after he was arrested. Santangelo Aff. at ¶ 25; Richards Dec. at ¶ 26.

Plaintiff claims that he "was in a lot of pain" when he arrived at the 79th Precinct and cannot recall exactly what transpired there. Plaintiff's Deposition at 192. However, Plaintiff believes that he was in custody for a "long time" – "maybe three, four hours" – before police released him. *Id.* at 190. Although Plaintiff recalls that the police returned his table and petitions before he was released, *id.* at 193, he alleges that the police kept the bullhorn. Plaintiff

claims that the police telephoned his home twice after his release to inform him that he could reclaim the bullhorn at the 84th Precinct, but that he was given incorrect voucher numbers both times and was unable to recover it. *Id*. at 155-56.

Sometime before July 15, 2002 – the date Plaintiff was due to appear in court on the summonses, Richard Dec., Ex. C – Plaintiff received letters informing him that the charges against him had been dismissed. On August 13, 2002, Plaintiff commenced an action against the New York State Board of Elections, seeking a court order directing that his name be placed on the Democratic primary ballot and that both his name and that of the "Rent is Too Damn High" Party be placed on the ballot for the general election for governor. *See* Complaint in *McMillan v. New York State Board of Elections*, No. 02-CV-4479 (NGG)(LB), at 8. Plaintiff alleged that the NYPD falsely imprisoned or illegally detained him on July 3, 2002, and violated his First Amendment rights, *id*. at 1-2, but did not name the NYPD or any of its officers as defendants. On August 21, 2002, Judge Garaufis dismissed the action as to the State Board of Elections, without prejudice to Plaintiff's filing a separate action against other entities. *See* Calendar Entry dated Aug. 21, 2002, in *McMillan*, No. 02-CV-4479.

On February 5, 2003, Plaintiff commenced this action by filing a five-page complaint against the City of New York, the NYPD and the 79th Precinct. Although the complaint alleged that jurisdiction was based on 42 U.S.C. § 1983 and focused on the events of July 3, 2002, the complaint did not name any of the individual officers involved in that incident. On February 11, 2004, Magistrate Judge Bloom issued an order directing Defendants' counsel to identify the officers involved in Plaintiff's arrest, and directing Plaintiff "to file an amended complaint ... deleting defendants New York City Police Department and the 79th Precinct, and adding the

individual defendants who he claims falsely arrested him ....” *McMillan v. City of New York*, No. 03-CV-626, slip op. at 1 (E.D.N.Y. Feb. 11, 2004).

On April 8, 2004, Plaintiff filed an amended complaint, adding Santangelo, Richards and another officer, James Armstrong, as defendants.  While Plaintiff complied with Magistrate Judge Bloom’s direction to delete the 79th Precinct from the caption, Plaintiff still named the NYPD as a defendant in his amended pleading.

The Amended Complaint does not specify which acts or omissions were allegedly committed by each of the three individual defendants, but alleges that the officers collectively violated his “First Amendment Rights.”  However, the pleading does not specify which First Amendment rights Plaintiff is invoking, or precisely how these rights were violated.  Indeed, immediately after alleging that there were “Violations of First Amendment Rights,” the Amended Complaint lists “false arrest, false imprisonment,” illegal detention and “kidnapping,” Amended Complaint at ¶ 3, as if these are examples of the manner in which Plaintiff’s First Amendment rights were violated.

The Amended Complaint makes no mention of the Fourth or Fourteenth Amendment. Yet, the pleading expressly alleges that the officers had “no Legal Right to put their hands on [him],” much less “take [him] off the streets lick [*sic*] ... [he] committe[d] a crime ....”  Amended Complaint at 3.  The Amended Complaint also does not allege facts relating to the confiscation of Plaintiff’s bullhorn, but requests that this Court issue an order directing Defendants to return the “Sound Device (Bull Horn) that was taken away ... by the Police Officers who arrested [him],” or to “replace it with a New One.”  *Id*. at 5 (emphasis omitted).

Defendants now move for summary judgment.  Although Defendants’ Memorandum of Law in Support of their Motion for Summary Judgment (“Defendants’ Memo”) contains six

points, only three of these need be addressed in this opinion. First, Defendants argue that Plaintiff cannot establish a claim for false arrest because Officer Richards had probable cause to arrest Plaintiff. Second, Defendants assert that Plaintiff's First Amendment right to free speech was not violated because the police were enforcing reasonable time, place and manner restrictions. Third, Defendants argue that they are not liable for the alleged loss of Plaintiff's bullhorn because it was returned to him on July 3, 2002, when he was released from the 79th Precinct. These three arguments, and Plaintiff's arguments in opposition thereto, are discussed in more detail below.

## *DISCUSSION*

### *The Summary Judgment Standard*

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that there is no genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the movant meets this burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990). The non-movant cannot avoid summary judgment "through mere speculation or conjecture" or "by vaguely asserting the existence of some unspecified disputed material facts." *Western World*, 922 F.2d at 121 (internal quotations and citations omitted). Moreover, the non-movant cannot rely on hearsay testimony which would not be admissible if testified to at trial. *See*, *e.g.*, *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999); Fed. R. Civ. P. 56(e).

### *Plaintiff's Claims under 42 U.S.C. § 1983*

Plaintiff's original pleading and his Amended Complaint both allege that "jurisdiction of this court is invoked pursuant to ... 42 U.S.C. [§] 1983." Complaint at ¶ 3; Amended Complaint at ¶ 3. Section 1983 itself "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)). Specifically, "[s]ection 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States." *Id*. In order to maintain a § 1983 action, a plaintiff must allege both that the conduct complained of was "committed by a person acting under color of state law" and "deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994).

In his Amended Complaint, Plaintiff expressly alleges "Violations of [his] First Amendment Rights," Amended Complaint at ¶ 3, but does not explain precisely how his First Amendment rights were violated. It is possible that plaintiff has confused the First and Fourth Amendments. After all, the Amended Complaint makes no reference to the Fourth Amendment, and lists false arrest, false imprisonment, illegal detention, and kidnapping as if these are examples of the manner in which his *First* Amendment rights have been violated. *See id*. However, Defendants, mindful of the obligation to construe a *pro se* plaintiff's pleadings liberally, *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) (per curiam), interpret Plaintiff's amended pleading as alleging both (1) false arrest and imprisonment claims and (2) a First Amendment claim for violation of Plaintiff's right to free speech. In addition, although

Plaintiff's amended complaint alleges no facts relating to the confiscation of his bullhorn,

Defendants address the issue of whether Plaintiff is entitled to compensation for the bullhorn.

While this Court might not interpret Plaintiff's Amended Complaint quite as liberally as

Defendants, this Court will nonetheless address all three of these claims.

### *False Arrest and Imprisonment*

Although Plaintiff alleges both false arrest and false imprisonment, these terms are

"largely synonymous because an imprisonment starts at the moment of arrest." *Jenkins v. City of*

*New York*, 478 F.3d 76, 88, n. 10 (2d Cir. 2007). Indeed, false arrest is sometimes referred to as

"a species of false imprisonment," *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir.

1995), since it is "simply false imprisonment accomplished by the means of an unlawful arrest."

*Jenkins*, 478 F.3d at 88, n. 10. Under the circumstances of this case, Plaintiff's claims that he

was "illegally detained" or kidnapped are also synonymous with "false arrest," since there is no

evidence that Plaintiff was detained before he was arrested and no evidence that Plaintiff's

reference to "kidnapping" alludes to anything other than his arrest by Officer Richards.

"To establish a claim for false arrest [or false imprisonment] under 42 U.S.C. § 1983, a

plaintiff must show that 'the defendant intentionally confined him without his consent and

without justification.'" *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quoting *Weyant v.*

*Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). Since probable cause constitutes justification for an

arrest, "there can be no claim for false arrest where the arresting officer had probable cause to

arrest the plaintiff." *Id.* "Probable cause to arrest exists when the officers have knowledge of, or

reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a

person of reasonable caution in the belief that an offense has been or is being committed by the

person to be arrested." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007). Probable cause is assessed on an objective basis, taking into account all facts known to the arresting officers at the time of the arrest. *See id.* An arresting officer's "state of mind" and the officer's subjective reason for making the arrest are, therefore, irrelevant to a probable cause determination. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).

In this case, Defendants argue that Plaintiff cannot state a claim for false arrest because Officer Richards had probable cause to arrest Plaintiff. In response, Plaintiff principally argues about the arresting officer's subjective reasons for arresting him, positing that the police became angry after he disobeyed their order to stop engaging in his political activities. *See* Plaintiff's Opposition, dated Dec. 18, 2007, at 1, 5. However, Plaintiff does not argue that the police lacked probable cause to arrest him.

Both parties' version of the events on the evening of July 3, 2002, leave no doubt that Officer Richards had probable cause to arrest Plaintiff. By all accounts, Plaintiff had a bullhorn and no permit when Santangelo and Richards approached him on the evening of July 3, 2002. According to both officers, Santangelo began the conversation with Plaintiff by asking him whether he had a permit to use the bullhorn. Santangelo Aff. at ¶ 11; Richards Dec. at ¶ 11. Plaintiff, who was hard of hearing and relied principally on lip reading, understood that Santangelo was talking about a permit. Plaintiff's Deposition at 123-24, 174-75. Although Plaintiff may have misunderstood the type of permit Santangelo was requesting, *id.* at 134, there is no question that Plaintiff neither had nor produced any permits, but instead argued that a permit was unnecessary. *Id.* at 168-69. Therefore, even assuming that Plaintiff did not specifically deny having a permit for the bullhorn, as the officers claim, Santangelo and Richards

were nonetheless entitled infer from Plaintiff's refusal to produce a permit and his argumentative response to Santangelo's question that Plaintiff had no permit for his bullhorn.

There is no question that Santangelo and Richards saw Plaintiff use the bullhorn. Both officers testified that they saw Plaintiff using the bullhorn as they approached the corner of Nostrand Avenue and Fulton Streets. Santangelo Aff. at ¶¶ 8-9; Richards Dec. at ¶¶ 8-9. Although Plaintiff denies that he was using his bullhorn when he first saw the officers approach, Plaintiff candidly admits that he used the bullhorn later in the encounter, despite being warned that he could not do so because he did not have a permit. Plaintiff's Deposition at 134, 153, 177.

Officer Richards had probable cause to arrest Plaintiff after he observed him using the bullhorn. Section 10-108 of the New York City Code requires a permit for the use or operation of sound devices in City streets. N.Y. City Code § 10-108(d). Subsection (d) provides, in pertinent part, that

> It shall be unlawful for any person to use or operate any sound device or apparatus, in, on, near or adjacent to any public street, park or place, unless such person shall have first obtained a permit to be issued by the police commissioner in the manner hereinafter prescribed ....

Violation of any provision of section 10-108 is punishable "by a fine of not more than one hundred dollars or imprisonment for thirty days, or both." N.Y. City Code § 10-108(j).

Section 140.10(1)(a) of New York's Criminal Procedure Law ("CPL") permits a police officer to arrest a person for "[a]ny offense" when he has probable cause to believe that such person has committed the offense in his presence. For purposes of CPL § 140.10, an "offense" is "conduct for which a sentence to a term of imprisonment or to a fine is provided by any law of this state or by any law, local law or ordinance of a political subdivision of this state." N.Y.

Penal Law § 10.00 (applicable to provisions of the CPL by operation of CPL § 1.20).  Since

violation of N.Y. City Code § 10-108 is punishable by either a fine or imprisonment or both, it

qualifies as an "offense" for which Plaintiff could be arrested.

For these reasons, there is no genuine issue concerning whether Officer Richards had

probable cause to arrest Plaintiff.  Since the existence of probable cause is "a complete defense"

to a claim of false arrest or false imprisonment, *Covington v. City of New York*, 171 F.3d 117,

122 (2d Cir. 1999) (quoting *Weyant*, 101 F.3d at 852), Defendants are entitled to summary

judgment with respect to Plaintiff's claims of false arrest and false imprisonment.

### First Amendment

This Court also finds that Plaintiff has failed to articulate a meritorious First Amendment

claim.  Although Plaintiff's complaint does not explain precisely how his First Amendment

rights were violated, Defendants assume that Plaintiff is alleging that his First Amendment right

to free speech was violated.  Noting that people who engage in political speech do not have a

constitutional right to do so "whenever and however and wherever" they please, Defendant's

Memo at 16 (quoting *Adderley v. Florida*, 385 U.S. 39, 48 (1966)), Defendants argue that the

police were properly enforcing reasonable time, place and manner restrictions of New York City

Administrative Code § 10-108.  Defendants' Memo at 16-17.

In his opposition papers, Plaintiff does not directly address Defendants' argument, but

instead asserts that "[p]oliticians campaigning are exempt" from New York City Administrative

Code § 10-108.  Plaintiff's Opposition at 5 (emphasis omitted).  Plaintiff further asserts that

"[e]very politician uses the BULL HORN during an election year," and that "[n]o politician in

the State of New York [has] ever been charged nor [have] they ever had to go through what [he

14

is] having to go through using the BULL HORN." *Id.* at 4-5 (emphasis in original).  Plaintiff does not cite to any authorities in support of these assertions.

Mindful of Plaintiff's *pro se* status, this Court has undertaken its own careful examination of the provisions of Administrative Code § 10-108 in an effort to determine if there is any basis for Plaintiff's assertions.   Section 10-108 creates a distinction between speech for commercial or business advertising purposes and all other forms of speech.  As to the former category, subsection (c) flatly prohibits the use or operation of "any sound device or apparatus in, on, near or adjacent to any public street, park or place."  As to the latter category, the use or operation of a sound device or apparatus is prohibited, absent a permit issued by the police commissioner.  N.Y. City Admin. Code § 10-108(d).  However, section 10-108 makes no distinction between political speech and any other type of protected speech.  Accordingly, this Court finds no basis in law for Plaintiff's assertion that persons engaging in political campaigning or other political speech are somehow exempt from the provisions of the Administrative Code.

As Defendants correctly note, the constitutionally protected nature of Plaintiff's speech does not afford him the absolute right to speak "whenever and however and wherever" he pleases.  *Adderley*, 385 U.S. at 48.  As the Supreme Court has noted

> [E]ven in a public forum the government may impose reasonable
> restrictions on the time, place, or manner of protected speech,
> provided the restrictions "are justified without reference to the
> content of the regulated speech, that they are narrowly tailored
> to serve a significant governmental interest, and that they leave open
> ample alternative channels for communication of the information."

*Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).  This Court notes that the time, place and manner restrictions contained in other provisions of § 10-108 and in the predecessor of this

Administrative Code provision have been upheld, even in cases involving political speech. *See, e.g., Housing Works, Inc. v. Kerik*, 283 F.3d 471 (2d Cir. 2002) (upholding provisions of § 10-108(g) against a constitutional challenge from an AIDS-advocacy organization which sought to rally in City Hall Plaza); *U.S. Labor Party v. Codd*, 527 F.2d 118 (2d Cir. 1975) (upholding the permit provision of § 10-108's predecessor against the challenge of a political party engaged in collecting signatures to place candidates on the ballot).

With respect to Plaintiff's second assertion – that "[n]o politician in the State of New York [has] ... ever had to go through what [he is] having to go through" in order to use a bullhorn – Plaintiff is simply incorrect. In fact, since the Second Circuit's 1975 decision in *Codd*, *supra*, politicians in this State have been on notice that they must obtain a permit before using a bullhorn to gather signatures. In *Codd*, the United States Labor Party ("USLP") and several of its members brought a § 1983 action against the police commissioner of New York City, arguing that New York City Administrative Code § 435-6.0(h) – a predecessor of § 10-108 – was unconstitutional. The plaintiffs in that case, like Plaintiff herein, were attempting to gather signatures in order to place the names of the USLP and its members on the ballot and felt aggrieved by the requirement that they purchase a permit for each site at which bullhorns were to be used. 527 F.2d at 119. The *Codd* Court explicitly held that the requirement was not unconstitutional, noting, *inter alia*, that the plaintiffs remained free to "gather signatures to put candidates on the ballot without the use of loudspeaker equipment." *Id*. at 120.

Plaintiff may be correct in stating that "[n]o politician in the State of New York [has] ever been charged" with a violation of § 10-108. Indeed, this Court's review of reported cases relating to § 10-108 and its predecessors has failed to uncover any criminal actions against

persons running for political office.  However, Plaintiff, whose pleadings do not specifically allege – or even suggest – an equal protection or selective prosecution claim, offers no basis for inferring any form of constitutional violation from the absence of prosecutions under § 10-108. In light of *Cobb* and the fact that arrests and/or prosecutions are generally detrimental to one's political career, it seems likely that the absence of reported cases in which politicians have been charged with violations of § 10-108 is explained by the fact that most other politicians are aware of, and comply with, the permit requirement or, if not, promptly comply with police demands that they stop using sound amplification devices without a permit.  Therefore, even assuming that "[n]o politician in the State of New York [has] ever been charged" with a violation of § 10-108, this fact alone would not be sufficient to establish a constitutional violation.

### *Plaintiff's Bullhorn*

Plaintiff's Amended Complaint contains no factual allegations relating to the NYPD's alleged confiscation of Plaintiff's bullhorn.  The only mention of this issue appears in the *ad damnum* clause, in which Plaintiff requests that this Court "[o]rder the return[] of my Sound Device (Bull Horn) that was taken away from me by the Police Officers who arrested me on the day I was arrested, or replace it with a New One."  Amended Complaint at 5 (emphasis omitted). Defendants construe this single sentence as raising a claim, but make no attempt to characterize it.  Rather, Defendants argue that this claim should be dismissed because the police returned all of Plaintiff's property to him before he was released from the 79th Precinct on July 3, 2002.

Defendants' argument is unpersuasive because there exists a genuine issue of material fact with respect to whether the police ever returned the bullhorn to Plaintiff.  To be sure, Defendants have provided ample evidence that the bullhorn was returned, including affidavits

from Santangelo and Richards – both of whom state that Plaintiff was released with all of his property, Santangelo Aff. at ¶ 25; Richards Dec. at ¶ 25-26 – and a declaration from William Simons, the Property Officer at the 79th Precinct, who states that he has "no recollection of a bullhorn being vouchered on or around July 3, 2002," and has been unable to locate a voucher for this property. *See* Declaration of William Simons, dated Aug. 24, 2005, at ¶¶ 3, 9-10. However, this evidence is controverted by Plaintiff's deposition testimony, in which he states that the police returned his table and petitions before he was released, but not his bullhorn. Plaintiff's Deposition at 193. Plaintiff further states that the police telephoned his home twice after his release to inform him that he could reclaim the bullhorn at the 84th Precinct, but that he was given incorrect voucher numbers both times and was unable to recover it. *Id*. at 155-56.

Although there is a genuine issue of material fact as to whether the bullhorn was returned, this Court need not resolve this issue. Even assuming that Plaintiff's bullhorn was not returned, Plaintiff has not alleged facts sufficient to state a claim under § 1983. As discussed previously, *ante* at 10, Plaintiff must establish a violation of the United States Constitution or federal law in order to make out a § 1983 claim. *See Pitchell*, 13 F.3d at 547. "Where ... an initial seizure of property was reasonable, defendants' failure to return the items does not, by itself, state a separate Fourth Amendment claim of unreasonable seizure." *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 187 (2d Cir, 2004). There is no question that the original seizure of the bullhorn was reasonable in this case, since it was an instrumentality of the offense charged. *See Turley v. Police Dept. of City of New York*, 167 F.3d 757, 763 (2d Cir. 1999) (upholding a City policy of seizing and retaining as evidence the sound amplifiers of musicians charged with violating the terms of their permit). Accordingly, even assuming that

Plaintiff's Amended Complaint alleged facts relating to the NYPD's retention of his bullhorn, these facts would not make out a Fourth Amendment violation.

"To the extent the Constitution affords [a plaintiff] any right with respect to a government agency's retention of lawfully seized property, it would appear to be procedural due process." *Shaul*, 363 F.3d at 187. However, to succeed on a procedural due process claim, a plaintiff must show that he "1) possessed a protected liberty or property interest 2) of which he was deprived without due process." *Rutigliano v. City of New York*, No. 07 Civ. 4614 (JSR), 2008 WL 110946, at *4 (S.D.N.Y Jan. 2, 2008) (citing *McMenemy v. City of Rochester*, 241 F.3d 279, 285-86 (2d Cir. 2001)). To even plead a procedural due process violation, a plaintiff must "allege where and from whom he attempted to retrieve the [property] and what he did to attempt to retrieve [it]." *Id*. Plaintiff's Amended Complaint contains no such allegations. At most, Plaintiff's amended pleading contains "conclusory allegations of a deprivation," which are insufficient to "support a claim for a procedural due process violation." *Id*.

Even if this Court were to give Plaintiff leave to further amend his complaint to add allegations consistent with his deposition testimony, these allegations would not state a procedural due process claim. Plaintiff's deposition testimony does not suggest that the NYPD intentionally withheld Plaintiff's bullhorn. Rather, Plaintiff testified that the police telephoned his home twice after his release to inform him that he could reclaim the bullhorn at the 84th Precinct, but that he was given incorrect voucher numbers both times. Plaintiff's Deposition at 155-56. At most, this testimony suggests that Plaintiff was unable to recover the bullhorn due to NYPD negligence. However, "[i]t is well established that mere negligence is insufficient as a matter of law to state a due process violation." *Shaul*, 363 F.3d at 187.

## CONCLUSION

For the foregoing reasons, Defendants motion for summary judgment is granted and this action is dismissed. The Clerk of Court is directed to enter judgment in favor of Defendants and against Plaintiff and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
February 4, 2009

*Sandra L. Townes*
SANDRA L. TOWNES
United States District Judge